(Slip Opinion) OCTOBER TERM, 2009 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GRAHAM COUNTY SOIL AND WATER CONSERVA- TION DISTRICT ET AL. *v.* UNITED STATES EX REL. WILSON

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 08–304.   Argued November 30, 2009—Decided March 30, 2010

The False Claims Act (FCA) authorizes both the Attorney General and private *qui tam* relators to recover from persons who make false or fraudulent payment claims to the United States, but it bars *qui tam* actions based upon the public disclosure of allegations or transactions in, *inter alia,* "a congressional, administrative, or Government Accounting Office [(GAO)] report, hearing, audit, or investigation." 31 U. S. C. §3730(e)(4)(A).   Here, federal contracts provided that two North Carolina counties would remediate areas damaged by flooding and that the Federal Government would shoulder most of the costs. Respondent Wilson, then an employee of a local government body involved in this effort, alerted local and federal officials about possible fraud.   Both the county and the State issued reports identifying potential irregularities in the contracts' administration.   Subsequently, Wilson filed a *qui tam* action, alleging, as relevant here, that petitioners, county conservation districts and local and federal officials, knowingly submitted false payment claims in violation of the FCA. The District Court ultimately dismissed for lack of jurisdiction because Wilson had not refuted that her action was based upon allegations publicly disclosed in the county and state reports, which it held were "administrative" reports under the FCA's public disclosure bar. In reversing, the Fourth Circuit concluded that only federal administrative reports may trigger the public disclosure bar.

*Held:* The reference to "administrative" reports, audits, and investigations in §3730(e)(4)(A) encompasses disclosures made in state and local sources as well as federal sources.   Pp. 4–21.

(a) Section 3730(e)(4)(A) specifies three categories of disclosures that can deprive federal courts of jurisdiction over *qui tam* suits. The language at issue is contained in the second category (Category 2). Pp. 4–5.

(b) The FCA's plain text does not limit "administrative" to federal sources. Because that term modifies "report, hearing, audit, or investigation" in a provision about "the public disclosure" of fraud on the United States, it is most naturally read to describe government agency activities. But since "administrative" is not itself modified by "federal," there is no immediately apparent basis for excluding state and local agency activities from its ambit. The interpretive maxim *noscitur a sociis*—"a word may be known by the company it keeps," *Russell Motor Car Co.* v. *United States*, 261 U. S. 514, 519—does not support the Fourth Circuit's more limited view. In Category 2, "administrative" is sandwiched between the federal terms "congressional" and "[GAO]," but these items are too few and too disparate to qualify as "a string of statutory terms," *S. D. Warren Co.* v. *Maine Bd. of Environmental Protection*, 547 U. S. 370, 378, or "items in a list," *Beecham* v. *United States*, 511 U. S. 368, 371, for *noscitur a sociis* purposes. Furthermore, evaluating "administrative" within the public disclosure bar's larger scheme, the Court observes that Category 2's terms are themselves sandwiched between phrases in Category 1 ("criminal, civil, or administrative hearing") and Category 3 ("news media") that are generally understood to include nonfederal sources; and Category 1 contains the same term ("administrative") that is at issue. Even if Category 1 were best understood to refer to adjudicative proceedings and Category 2 to legislative or quasi-legislative activities, state and local administrative sources of a legislative-type character are presumably just as public, and just as likely to put the Federal Government on notice of a potential fraud, as state and local administrative hearings of an adjudicatory character. The FCA's overall federal focus shines no light on the specific question whether the public disclosure bar extends to nonfederal contexts. And the fact that state legislative sources are not included in §3730(e)(4)(A) carries no clear implications for the status of state administrative sources. Pp. 5–12.

(c) The legislative record does not support an exclusively federal interpretation of "administrative." The current §3730(e)(4)(A) was enacted to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits. How exactly the statute came to strike this balance as it did is uncertain, as significant substantive changes—including the introduction of "administrative" in Category 2—were inserted without floor debate or other discussion, as "technical" amendments. Though Congress wanted "to strengthen

Syllabus

the Government's hand in fighting false claims," *Cook County* v. *United States ex rel. Chandler*, 538 U. S. 119, 133–134, and encourage more *qui tam* suits, it also determined to bar a subset of those suits that it deemed unmeritorious or downright harmful. The question here concerns that subset's precise scope; and on that matter, the record is all but opaque, leaving no "evident legislative purpose" to guide resolution of this discrete issue, *United States* v. *Bornstein*, 423 U. S. 303, 310. Pp. 12–18.

(d) Respondent's additional arguments in favor of limiting "administrative" to federal sources are unpersuasive. Pp. 18–20.

528 F. 3d 292, reversed and remanded.

STEVENS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, GINSBURG, and ALITO, JJ., joined, and in which SCALIA, J., joined except as to Part IV. SCALIA, J., filed an opinion concurring in part and concurring in the judgment. SOTOMAYOR, J., filed a dissenting opinion, in which BREYER, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 08–304

————

## GRAHAM COUNTY SOIL AND WATER CONSERVATION DISTRICT, ET AL., PETITIONERS *v.* UNITED STATES EX REL. KAREN T. WILSON

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[March 30, 2010]

JUSTICE STEVENS delivered the opinion of the Court.

Since its enactment during the Civil War, the False Claims Act, 31 U. S. C. §§3729–3733, has authorized both the Attorney General and private *qui tam* relators to recover from persons who make false or fraudulent claims for payment to the United States. The Act now contains a provision barring *qui tam* actions based upon the public disclosure of allegations or transactions in certain specified sources. §3730(e)(4)(A). The question before us is whether the reference to "administrative" reports, audits, and investigations in that provision encompasses disclosures made in state and local sources as well as federal sources. We hold that it does.[1]

---

[1] On March 23, 2010, the President signed into law the Patient Protection and Affordable Care Act, Pub. L. 111–148, 124 Stat. 119. Section 10104(j)(2) of this legislation replaces the prior version of 31 U. S. C. §3730(e)(4) with new language. The legislation makes no mention of retroactivity, which would be necessary for its application to pending cases given that it eliminates petitioners' claimed defense to a *qui tam* suit. See *Hughes Aircraft Co.* v. *United States ex rel. Schumer*, 520 U. S. 939, 948 (1997). Throughout this opinion, we use the present

I

In 1995 the United States Department of Agriculture (USDA) entered into contracts with two counties in North Carolina authorizing them to perform, or to hire others to perform, cleanup and repair work in areas that had suffered extensive flooding. The Federal Government agreed to shoulder 75 percent of the contract costs. Respondent Karen T. Wilson was at that time an employee of the Graham County Soil and Conservation District, a special-purpose government body that had been delegated partial responsibility for coordinating and performing the remediation effort. Suspecting possible fraud in connection with this effort, Wilson voiced her concerns to local officials in the summer of 1995. She also sent a letter to, and had a meeting with, agents of the USDA.

Graham County officials began an investigation. An accounting firm hired by the county performed an audit and, in 1996, issued a report (Audit Report) that identified several potential irregularities in the county's administration of the contracts. Shortly thereafter, the North Carolina Department of Environment, Health, and Natural Resources issued a report (DEHNR Report) identifying similar problems. The USDA's Office of Inspector General eventually issued a third report that contained additional findings.

In 2001 Wilson filed this action, alleging that petitioners, the Graham County and Cherokee County Soil and Water Conservation Districts and a number of local and federal officials, violated the False Claims Act (FCA) by knowingly submitting false claims for payment pursuant to the 1995 contracts. She further alleged that petitioners retaliated against her for aiding the federal investigation of those false claims. Following this Court's review of the

———————

tense in discussing the statute as it existed at the time this case was argued.

statute of limitations applicable to Wilson's retaliation claim, *Graham County Soil & Water Conservation Dist.* v. *United States ex rel. Wilson*, 545 U. S. 409 (2005), the Court of Appeals ordered that that claim be dismissed as time barred. 424 F. 3d 437 (CA4 2005). On remand, the District Court subsequently dismissed Wilson's *qui tam* action for lack of jurisdiction. App. to Pet. for Cert. 95a–105a. The court found that Wilson had failed to refute that her action was based upon allegations publicly disclosed in the Audit Report and the DEHNR Report. *Id.,* at 95a–98a. Those reports, the District Court determined, constituted "administrative . . . report[s], . . . audit[s], or investigation[s]" within the meaning of the FCA's public disclosure bar, 31 U. S. C. §3730(e)(4)(A).

The Court of Appeals reversed the judgment of the District Court because the reports had been generated by state and local entities. "[O]nly *federal* administrative reports, audits or investigations," the Fourth Circuit concluded, "qualify as public disclosures under the FCA." 528 F. 3d 292, 301 (2008) (emphasis added). The Circuits having divided over this issue,[2] we granted certiorari to resolve the conflict. 557 U. S. \_\_ (2009).

———————

[2] Compare 528 F. 3d, at 301–307 (limiting this portion of the public disclosure bar to federal sources), and *United States ex rel. Dunleavy* v. *County of Delaware*, 123 F. 3d 734, 745–746 (CA3 1997) (same), with *United States ex rel. Bly-Magee* v. *Premo*, 470 F. 3d 914, 918–919 (CA9 2006) (concluding that state and local sources may qualify), cert. denied, 552 U. S. 1165 (2008), and *Battle* v. *Board of Regents for State of Ga.*, 468 F. 3d 755, 762 (CA11 2006) *(per curiam)* (assuming without analysis that state audits may qualify). The Eighth Circuit appears to have taken a "middle road" on this issue, 528 F. 3d, at 301, holding that disclosures made in nonfederal forums may count as "'administrative . . . report[s]'" or "'audit[s]'" under §3730(e)(4)(A) in some instances, as when they relate to "a cooperative federal-state program through which the federal government provides financial assistance." *Hays* v. *Hoffman*, 325 F. 3d 982, 989, cert. denied, 540 U. S. 877 (2003).

## II

We have examined the FCA's *qui tam* provisions in several recent opinions.[3]  At issue in this case is the FCA's public disclosure bar, which deprives courts of jurisdiction over *qui tam* suits when the relevant information has already entered the public domain through certain channels.  The statute contains three categories of jurisdiction-stripping disclosures.  Following the example of the Court of Appeals, see 528 F. 3d, at 300–301, we have inserted Arabic numerals to identify these categories:

> "No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions [1] in a criminal, civil, or administrative hearing, [2] in a congressional, administrative, or Government Accounting Office [(GAO)] report, hearing, audit, or investigation, or [3] from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source[4] of the information."  §3730(e)(4)(A) (footnote omitted).

This dispute turns on the meaning of the adjective "administrative" in the second category (Category 2): whether it embraces only forums that are federal in nature, as respondent alleges, or whether it extends to disclosures made in state and local sources such as the DEHNR Re-

_____

[3] See, *e.g., Rockwell Int'l Corp.* v. *United States*, 549 U. S. 457 (2007) (construing §3730(e)(4)(A)'s original source exception); *Cook County* v. *United States ex rel. Chandler*, 538 U. S. 119 (2003) (holding that local governments are subject to *qui tam* liability); *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U. S. 765 (2000) (holding that States are not subject to private FCA actions).

[4] A separate statutory provision defines an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information."  31 U. S. C. §3730(e)(4)(B).

port and the Audit Report, as petitioners allege.

In debating this question, petitioners have relied primarily on the statute's text whereas respondent and the Solicitor General, as her *amicus*, have relied heavily on considerations of history and policy. Although there is some overlap among the three types of argument, it is useful to discuss them separately. We begin with the text.

### III

The term "administrative" "may, in various contexts, bear a range of related meanings," *Chandler* v. *Judicial Council of Tenth Circuit*, 398 U. S. 74, 103, n. 8 (1970) (Harlan, J., concurring in denial of writ), pertaining to private bodies as well as to governmental bodies. When used to modify the nouns "report, hearing, audit, or investigation," in the context of a statutory provision about "the public disclosure" of fraud on the United States, the term is most naturally read to describe the activities of governmental agencies. See Black's Law Dictionary 49 (9th ed. 2009) (hereinafter Black's) (defining "administration," "[i]n public law, [as] the practical management and direction of the executive department and its agencies"). Given that "administrative" is not itself modified by "federal," there is no immediately apparent textual basis for excluding the activities of state and local agencies (or their contractors) from its ambit. As the Court of Appeals recognized, "the statute by its express terms does not limit its reach to federal administrative reports or investigations." 528 F. 3d, at 301. "[T]here is nothing inherently federal about the word 'administrative,' and Congress did not define the term in the FCA." *Id.,* at 302.

The Court of Appeals' conclusion that "administrative" nevertheless reaches only federal sources rested on its application of the interpretive maxim *noscitur a sociis*. See *id.,* at 302–305. This maxim, literally translated as "'it is known by its associates,'" Black's 1160, counsels

lawyers reading statutes that "a word may be known by
the company it keeps," *Russell Motor Car Co.* v. *United
States*, 261 U. S. 514, 519 (1923).  All participants in this
litigation acknowledge that the terms "congressional" and
"[GAO]" are federal in nature; Congress is the Legislative
Branch of the Federal Government,[5] and the GAO is a
federal agency.[6]  Relying on our opinions in *S. D. Warren
Co.* v. *Maine Bd. of Environmental Protection*, 547 U. S.
370 (2006), and *Beecham* v. *United States*, 511 U. S. 368
(1994), the Court of Appeals reasoned that "the placement
of 'administrative' squarely in the middle of a list of obvi-
ously federal sources strongly suggests that 'administra-
tive' should likewise be restricted to *federal* administrative
reports, hearings, audits, or investigations."  528 F. 3d, at
302.  In so holding, the Court of Appeals embraced what
we might call the Sandwich Theory of the Third Circuit.
Both courts "'f[ou]nd it hard to believe that the drafters of
this provision intended the word "administrative" to refer
to both state and federal reports when it lies sandwiched
between modifiers which are unquestionably federal in
character.'"  *Ibid.* (quoting *United States ex rel. Dunleavy*
v. *County of Delaware*, 123 F. 3d 734, 745 (CA3 1997)).

    We find this use of *noscitur a sociis* unpersuasive.  A list

--------

[5] See U. S. Const., Art. I, §1; *id.,* §4, cl. 1 (distinguishing "State . . .
Legislature[s]" from "the Congress").

[6] The statute refers to the GAO, mistakenly, as the "Government
Accounting Office."  It is undisputed that the intended referent was the
*General* Accounting Office, now renamed the Government Accountabil-
ity Office.  See 31 U. S. C. §3730, p. 254, n. 2 (compiler's note); 528 F. 3d
292, 300, n. 4 (CA4 2008); *United States ex rel. Mistick PBT* v. *Housing
Authority of Pittsburgh*, 186 F. 3d 376, 387 (CA3 1999) (Alito, J.), cert.
denied, 529 U. S. 1018 (2000); see also *Mistick*, 186 F. 3d, at 398
(Becker, C. J., dissenting) (noting that courts have "frequently" made
the same scrivener's error).  We have described the GAO as "an inde-
pendent agency within the Legislative Branch that exists in large part
to serve the needs of Congress."  *Bowsher* v. *Merck & Co.*, 460 U. S. 824,
844 (1983).

of three items, each quite distinct from the other no matter how construed, is too short to be particularly illuminating. Although this list may not be "completely disjunctive," 528 F. 3d, at 302—it refers to "congressional, administrative, or [GAO]" sources, §3730(e)(4)(A), rather than "congressional, *or* administrative, or [GAO]" sources—neither is it completely harmonious. The substantive connection, or fit, between the terms "congressional," "administrative," and "GAO" is not so tight or so self-evident as to demand that we "rob" any one of them "of its independent and ordinary significance." *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 338–339 (1979); see also *Russell*, 261 U. S., at 519 ("That a word may be known by the company it keeps is . . . not an invariable rule, for the word may have a character of its own not to be submerged by its association"). The adjectives in Category 2 are too few and too disparate to qualify as "a string of statutory terms," *S. D. Warren Co.*, 547 U. S., at 378, or "items in a list," *Beecham*, 511 U. S., at 371, in the sense that we used those phrases in the cited cases.[7]

————————

[7] In *Jarecki* v. *G. D. Searle & Co.*, 367 U. S. 303 (1961), the Court applied the *noscitur a sociis* maxim in construing a statutory provision that referred to "'[i]ncome resulting from exploration, discovery, or prospecting,'" *id.,* at 305 (quoting §456(a)(2)(B) of the Internal Revenue Code of 1939). JUSTICE SOTOMAYOR contends that "the three terms in Category 2 are no more 'distinct' or 'disparate' than the phrase at issue in *Jarecki*." *Post*, at 4 (dissenting opinion) (citation omitted). We disagree. Whether taken in isolation or in context, the phrase "congressional, administrative, or GAO" is not as cohesive as the phrase "exploration, discovery, or prospecting." That is one reason why *noscitur a sociis* proved illuminating in *Jarecki*, and why it is less helpful in this case. On their "face," the terms "exploration," "discovery," and "prospecting" all describe processes of searching, seeking, speculating; the centrality of such activities to "the oil and gas and mining industries" gave a clue that it was those industries Congress had in mind when it drafted the provision. 367 U. S., at 307 (internal quotation marks omitted). The terms "congressional," "administrative," and "GAO" do not share any comparable core of meaning—or indeed any

More important, we need to evaluate "administrative" within the larger scheme of the public disclosure bar. Both parties acknowledge, as they must, that "[s]tatutory language has meaning only in context," *Graham County Soil*, 545 U. S., at 415; where they differ is in determining the relevant context.  The Sandwich Theory presupposes that Category 2 is the only piece of §3730(e)(4)(A) that matters.  We agree with petitioners, however, that *all* of the sources listed in §3730(e)(4)(A) provide interpretive guidance.  All of these sources drive at the same end: specifying the types of disclosures that can foreclose *qui tam* actions.  In light of the public disclosure bar's grammatical structure, it may be convenient and even clarifying to parse the list of sources into three categories.  But it does not follow that we should treat these categories as islands unto themselves.  Courts have a "duty to construe statutes, not isolated provisions." *Gustafson* v. *Alloyd Co.*, 513 U. S. 561, 568 (1995).

When we consider the entire text of the public disclosure bar, the case for limiting "administrative" to federal sources becomes significantly weaker.  The "news media" referenced in Category 3 plainly have a broader sweep. The Federal Government funds certain media outlets, and certain private outlets have a national focus; but no one contends that Category 3 is limited to these sources. There is likewise no textual basis for assuming that the "criminal, civil, or administrative hearing[s]" listed in Category 1 must be federal hearings.[8]  Of the numerous

_____

"common feature" at all, *post*, at 4—apart from a governmental connotation.  It takes the Sandwich Theory to graft a federal limitation onto "administrative."

    [8] A number of lower courts have concluded that, as used in Category 1, "'hearing' is roughly synonymous with 'proceeding.'" *United States ex rel. Springfield Terminal R. Co.* v. *Quinn*, 14 F. 3d 645, 652 (CADC 1994); see also 1 J. Boese, Civil False Claims and *Qui Tam* Actions §4.02[B], p. 4–59, and n. 231 (3d ed. 2006) (hereinafter Boese); C.

types of sources that serve a common function in §3730(e)(4)(A), then, only two are distinctly federal in nature, while one (the news media) is distinctly nonfederal in nature.

If the Court of Appeals was correct that the term "administrative" encompasses state and local sources in Category 1, see 528 F. 3d, at 303, it becomes even harder to see why the term would not do the same in Category 2. See *Erlenbaugh* v. *United States*, 409 U. S. 239, 243 (1972) ("[A] legislative body generally uses a particular word with a consistent meaning in a given context"). Respondent and the Solicitor General assert that §3730(e)(4)(A)'s two references to "administrative" can be distinguished because Category 1 is best understood to refer to adjudicative proceedings, whereas Category 2 is best understood to refer to legislative or quasi-legislative activities such as rulemaking, oversight, and investigations. See Brief for Respondent 16–18; Brief for United States as *Amicus Curiae* 25–26 (hereinafter Brief for United States). Yet even if this reading were correct, state and local administrative reports, hearings, audits, and investigations of a legislative-type character are presumably just as public, and just as likely to put the Federal Government on notice of a potential fraud, as state and local administrative hearings of an adjudicatory character.[9]

————————

Sylvia, The False Claims Act: Fraud Against the Government §11:35, p. 642 (2004) (hereinafter Sylvia).

[9] See *Bly-Magee*, 470 F. 3d, at 918 ("Indeed, the statute would seem to be inconsistent if it included state and local administrative hearings as sources of public disclosures [in Category 1] and then, in the next breath, excluded state administrative reports as sources"); *In re Natural Gas Royalties Qui Tam Litigation*, 467 F. Supp. 2d 1117, 1143–1144 (Wyo. 2006) ("There is no reason to conclude that Congress intended to limit administrative reports, audits, and investigations to *federal* actions, while simultaneously allowing all *state* and *local* civil litigation, *state* and *local* administrative hearings, and *state* and *local* news media to be treated as public disclosures. To interpret the statute so

Respondent and the Solicitor General try to avoid this inference, and to turn a weakness into a strength, by further averring that the sources listed in Category 1 are themselves only federal. See Brief for Respondent 23–24; Brief for United States 25–26. No court has ever taken such a view of these sources. See 528 F. 3d, at 303 (citing cases from the Third, Fourth, Fifth, Ninth, and Eleventh Circuits and stating that "[t]he courts have easily concluded that [Category 1] applies to state-level hearings"); Sylvia §11:37, at 643, n. 1 (citing additional cases).[10] The arguments in favor of reading a federal limitation into Category 1 are supported, if at all, by legislative history and policy; they find no support in the statute's text.

Moving from the narrow lens of the Sandwich Theory to a bird's eye view, respondent and the Solicitor General also maintain that the "exclusively federal focus" of the FCA counsels against reading the public disclosure bar to encompass nonfederal sources. Brief for Respondent 10, 18; Brief for United States 13. The FCA undoubtedly has a federal focus. But so does every other federal statute.

———————

narrowly would have the anomalous result of allowing public disclosure status to the most obscure local news report and the most obscure state and local civil lawsuit or administrative hearing, but denying public disclosure status to a formal public report of a state government agency").

[10] Following the Court of Appeals, see 528 F. 3d, at 303, respondent asserts that only the Ninth Circuit, in *A-1 Ambulance Serv., Inc.* v. *California*, 202 F. 3d 1238, 1244 (2000), has explicitly considered and rejected the argument that Category 1 is limited to federal sources. Brief for Respondent 23–24. At least one other Circuit, however, has done the same, see *United States ex rel. Hafter* v. *Spectrum Emergency Care, Inc.*, 190 F. 3d 1156, 1161, n. 6 (CA10 1999), and no lower court, as far as we are aware, has so much as suggested that an alternative construction might be viable. Moreover, the Third, Fifth, and Eleventh Circuit cases cited by the Court of Appeals postdate *A-1 Ambulance* and *Dunleavy*, 123 F. 3d 734, both of which put litigants and courts on notice of the possibility that §3730(e)(4)(A) might be limited to federal sources.

And as respondent and the Solicitor General elsewhere
acknowledge, quite a few aspects of the FCA, including a
reference to "administrative" proceedings in §3733(*l*)
(7)(A)[11] and the reference to "news media" in
§3730(e)(4)(A) itself, are not just federal. In any event, the
"federal focus" of the statute, as a whole, does not shine
light on the specific question whether the public disclosure
bar extends to certain nonfederal contexts. It is the fact of
"public disclosure"—not Federal Government creation or
receipt—that is the touchstone of §3730(e)(4)(A).

Respondent and the Solicitor General make one last
argument grounded in the statutory text: It would be
anomalous, they say, for state and local administrative
reports to count as public disclosures, when state legisla-
tive reports do not. See Brief for Respondent 15; Brief for
United States 15–16. Yet neither respondent nor the
Solicitor General disputes the contention of petitioners
and their *amici* that, at the time the public disclosure bar
was enacted in 1986, Congress rarely gave state legisla-
tures a meaningful role in administering or overseeing
federally funded programs. See Brief for Petitioners 36–
39; Brief for National League of Cities et al. as *Amici
Curiae* 8–13. As in the instant case, the Federal Govern-
ment was far more likely to enter into contracts with, and
to provide moneys to, state and local executive agencies.
Whether or not state legislative sources *should* have been
included in §3730(e)(4)(A), their exclusion therefore car-
ries no clear implications for the status of state adminis-
trative sources.

In sum, although the term "administrative" may be
sandwiched in Category 2 between terms that are federal

_____

[11] On its face, §3733(*l*)(7)(A) is silent as to whether it includes nonfed-
eral proceedings. Respondent and the Solicitor General suggest that it
does, though they fairly argue that this provision, relating to civil
investigative demands, has little if any relevance to the case at hand.
See Brief for Respondent 21, n. 8; Brief for United States 31–32.

in nature, those terms are themselves sandwiched be-
tween phrases that have been generally understood to
include nonfederal sources; and one of those phrases, in
Category 1, contains the exact term that is the subject of
our inquiry.  These textual clues negate the force of the
*noscitur a sociis* canon, as it was applied by the Court of
Appeals.[12]  We are not persuaded that the associates with
which "administrative" keeps company in §3730(e)(4)(A)
endow it with an exclusively federal character.

## IV

As originally enacted, the FCA did not limit the sources
from which a relator could acquire the information to
bring a *qui tam* action.  In *United States ex rel. Marcus* v.
*Hess*, 317 U. S. 537 (1943), we upheld the relator's recov-
ery even though he had discovered the fraud by reading a
federal criminal indictment—a quintessential "parasitic"
suit.  *Id.,* at 545–548; see *id.,* at 545 ("Even if, as the gov-
ernment suggests, the petitioner has contributed nothing
to the discovery of this crime, he has contributed much to
accomplishing one of the purposes for which the Act was
passed").  Congress promptly reacted to that decision by
amending the statute to preclude *qui tam* actions "based
upon evidence or information in the possession of the
United States, or any agency, officer or employee thereof,

---

[12] The Court of Appeals repeatedly referred to the three categories in
§3730(e)(4)(A) as "clauses."  See 528 F. 3d, at 300–305.  Were they in
fact clauses rather than prepositional phrases, reliance on *noscitur a
sociis* might have been supported by one of our earliest cases using
that term, *Watson* v. *Mercer*, 8 Pet. 88, 105 (1834) (Reporter's statement
of the case), which suggested that "different clauses of the same sen-
tence" should be presumed "to embrace the subject matter of the
sentence."  The Court of Appeals' mistaken reference to "clauses" is of
course less significant than its failure to treat the public disclosure bar
as an integrated whole.  Cf. Stevens, The Shakespeare Canon of Statu-
tory Construction, 140 U. Pa. L. Rev. 1373, 1376 (1992) (emphasizing
importance of reading provisions in their broader statutory context).

at the time such suit was brought." Act of Dec. 23, 1943, 57 Stat. 609 (codified at 31 U. S. C. §232(C) (1946 ed.)). This amendment erected what came to be known as a Government knowledge bar: "[O]nce the United States learned of a false claim, only the Government could assert its rights under the FCA against the false claimant." *Hughes Aircraft Co.* v. *United States ex rel. Schumer*, 520 U. S. 939, 949 (1997) (internal quotation marks omitted). In the years that followed the 1943 amendment, the volume and efficacy of *qui tam* litigation dwindled. "Seeking the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own," *United States ex rel. Springfield Terminal R. Co.* v. *Quinn*, 14 F. 3d 645, 649 (CADC 1994), Congress overhauled the statute once again in 1986 "to make the FCA a 'more useful tool against fraud in modern times,'" *Cook County* v. *United States ex rel. Chandler*, 538 U. S. 119, 133 (2003) (quoting S. Rep. No. 99–345, p. 2 (1986) (hereinafter S. Rep.)).

The present text of §3730(e)(4) was enacted in 1986 as part of this larger reform. Congress apparently concluded that a total bar on *qui tam* actions based on information already in the Government's possession thwarted a significant number of potentially valuable claims. Rather than simply repeal the Government knowledge bar, however, Congress replaced it with the public disclosure bar in an effort to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits such as the one in *Hess*. How exactly §3730(e)(4) came to strike this balance in the way it did is a matter of considerable uncertainty. The House and Senate Judiciary Committees each reported bills that contained very different public disclosure bars from the one that emerged in the Statutes at Large; the Senate bill, for example, did not

include the words "administrative," "audit," or "investiga-
tion" in its version of Category 2, nor did it contain an
original source exception.  See S. Rep., at 42–43 (text of
proposed §3730(e)(4)).[13]

   In respondent and her *amici*'s view, this background
counsels in favor of an exclusively federal interpretation of
"administrative" for three separate reasons.  First, the
drafting history of the public disclosure bar suggests that
Congress intended such a result.  Second, a major aim of
the 1986 amendments was to limit the scope of the Gov-
ernment knowledge bar, and "[c]onstruing [§3730(e)(4)(A)]
as limited to disclosures in federal proceedings furthers
Congress's purpose 'to encourage more private enforce-
ment suits.'"  Brief for United States 21 (quoting S. Rep.,
at 23–24).  Third, whereas federal administrative proceed-
ings can be presumed to provide the Attorney General
with a fair opportunity to decide whether to bring an FCA
action based on revelations made therein, the Attorney
General is much less likely to learn of fraud disclosed in
state proceedings.  Respondent and her *amici* further
maintain that it would be perverse to include nonfederal
sources in Category 2, as local governments would then be
able to shield themselves from *qui tam* liability by dis-
cretely disclosing evidence of fraud in "public" reports.[14]

   These arguments are reasonable so far as they go, but
they do not go very far.  As many have observed, the draft-
ing history of the public disclosure bar raises more ques-
tions than it answers.[15]  Significant substantive changes—

_____

   [13] See also H. R. Rep. No. 99–660, pp. 2–3 (1986) (text of proposed
§3730(b)(5)).  The public disclosure bar that was enacted more closely
resembles the version in the Senate bill.

   [14] State governments are already shielded from *qui tam* liability un-
der our precedent.  *Stevens*, 529 U. S. 765.

   [15] See, *e.g., Dunleavy*, 123 F. 3d, at 745 ("Congress gave us little spe-
cific guidance to determine the scope of public disclosure sources");
*United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P. A.* v.

including the introduction of the term we are construing in this case—were inserted without floor debate, as "technical" amendments. That the original Senate bill mentioned only congressional and GAO sources in Category 2 is therefore of little moment. Neither the House nor the Senate Committee Report explained why a federal limitation would be appropriate, and the subsequent addition of "administrative" sources to this Category might be taken as a sign that such a limitation was rejected by the full Chambers.[16]

—————————

*Prudential Ins. Co.*, 944 F. 2d 1149, 1154 (CA3 1991) ("The bill that eventuated in the 1986 amendments underwent substantial revisions during its legislative path. This provides ample opportunity to search the legislative history and find some support somewhere for almost any construction of the many ambiguous terms in the final version"); *id.,* at 1163 (Scirica, J., dissenting) ("One difficulty in interpreting the 1986 amendments is that Congress was never completely clear about what kind of 'parasitic' suits it was attempting to avoid"); Boese §4.02[A], at 4–46 ("The present Section 3730(e)(4) was enacted . . . without explanation by Congress"); *id.,* §4.02[A], at 4–47 to 4–48 ("[A]pplicable legislative history explaining versions [of §3730(e)(4)] not adopted is of little help in deciphering this provision. Because Section 3730(e)(4) was drafted subsequent to the completion of the House and Senate Committee reports on the proposed False Claims Act Amendments, those reports, which contained discussion of altogether different bars, cannot be used in interpreting it. And the sponsors' interpretations of the provision ultimately enacted . . . are spare, often incorrect, and wide-ranging enough to provide some support for almost any construction of its many ambiguities").

[16] JUSTICE SOTOMAYOR makes a valiant effort to unearth from the legislative history "the balance Congress evidently sought to achieve through the 1986 amendments." *Post*, at 10. But her reconstruction of the history assigns little weight to the side of this balance preserved by the public disclosure bar: the desire to minimize "the potential for parasitic lawsuits by those who learn of the fraud through public channels and seek remuneration although they contributed nothing to the exposure of the fraud," *United States ex rel. Doe* v. *John Doe Corp.*, 960 F. 2d 318, 319 (CA2 1992). And her narrative contains no account of why Category 2 emerged in the form that it did. Any such account would necessarily be an exercise in speculation, as the record is silent

Respondent and her *amici* place particular emphasis on a remark made by the lead sponsor of the Senate bill, Senator Grassley. See Brief for Respondent 29; Brief for United States 20; Brief for American Center for Law and Justice as *Amicus Curiae* 13–14; Brief for Taxpayers Against Fraud Education Fund as *Amicus Curiae* 30–31. In a floor statement, Grassley said that "the term 'Government' in the definition of original source is meant to include any Government source of disclosures cited in [the public disclosure bar]; that is[,] Government includes Congress, the General Accounting Office, any executive or independent agency as well as all other governmental bodies that may have publicly disclosed the allegations." 132 Cong. Rec. 20536 (1986). Yet even if a single sentence by a single legislator were entitled to any meaningful weight, Senator Grassley's remark merely begs the question before us. His formulation fails to indicate whether the "other governmental bodies" may be state or local bodies. It also turns on a term, "Government" with a capital "G," that does not appear in the codified version of the public disclosure bar, which Congress subsequently revised in numerous respects prior to passage.

There is, in fact, only one item in the legislative record that squarely corroborates respondent's reading of the statute: a letter sent by the primary sponsors of the 1986 amendments to the Attorney General in 1999. See 145 Cong. Rec. 16032 (1999) (reproducing text of letter in which Rep. Berman and Sen. Grassley state: "We did intend, and any fair reading of the statute will confirm, that the disclosure must be in a federal criminal, civil or administrative hearing. Disclosure in a state proceeding

———————

on the matter. In our view, neither the general trajectory of 20th-century FCA reform nor the specific statements made during the 1986 legislative process clearly point one way or the other on the question before us.

of any kind should not be a bar to a subsequent qui tam suit"). Needless to say, this letter does not qualify as legislative "history," given that it was written 13 years after the amendments were enacted. It is consequently of scant or no value for our purposes.[17]

We do not doubt that Congress passed the 1986 amendments to the FCA "to strengthen the Government's hand in fighting false claims," *Cook County*, 538 U. S., at 133–134, and "to encourage more private enforcement suits," S. Rep., at 23–24. It is equally beyond cavil, however, that Congress passed the public disclosure bar to *bar* a subset of those suits that it deemed unmeritorious or downright harmful. The question before us concerns the precise scope of that subset; and on this matter, the record is all but opaque. While "the absence of specific legislative history in no way modifies the conventional judicial duty to give faithful meaning to the language Congress adopted in the light of the evident legislative purpose in enacting the law in question," *United States* v. *Bornstein*, 423 U. S.

––––––––––

[17] See *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 118 (1980); *Hamdan* v. *Rumsfeld*, 548 U. S. 557, 580, n. 10 (2006); see also *Hafter*, 190 F. 3d, at 1161, n. 6 (refusing to credit the Berman-Grassley letter in interpreting the public disclosure bar). Respondent and her *amici* additionally contend that the enactment of the Program Fraud Civil Remedies Act of 1986 (PFCRA), 100 Stat. 1934 (codified at 31 U. S. C. §3801 *et seq.*), shortly before the enactment of the FCA amendments supports their reading of the latter. See Brief for Respondent 30–33; Brief for United States 14–15; Brief for Taxpayers Against Fraud Education Fund as *Amicus Curiae* 28–29. Yet while "there is no question that the PFCRA was designed to operate in tandem with the FCA," *Stevens*, 529 U. S., at 786, n. 17, or that the PFCRA is addressed to federal administrative agencies, there is also no explicit evidence to suggest that Congress intended to limit Category 2's reference to "administrative" sources to the same set of agencies. The FCA's public disclosure bar serves a distinct function not replicated in the PFCRA; the text of the public disclosure bar contains no reference to the PFCRA; and no Member of Congress, so far as we are aware, articulated any such intent.

303, 310 (1976), there is no "evident legislative purpose" to guide our resolution of the discrete issue that confronts us.

V

Respondent and her *amici* likewise fail to prove their case that petitioners' reading of the statute will lead to results that Congress could not have intended. Their argument rests on an empirical proposition: "While federal inquiries and their outcomes are readily available to Department of Justice [(DOJ)] attorneys, many state and local reports and investigations never come to the attention of federal authorities." Brief for United States 22; see also 528 F. 3d, at 306 ("Because the federal government is unlikely to learn about state and local investigations, a large number of fraudulent claims against the government would go unremedied without the financial incentives offered by the *qui tam* provisions of the FCA"). This proposition is not implausible, but it is sheer conjecture. Numerous federal investigations may be occurring at any given time, and DOJ attorneys may not reliably learn about their findings. DOJ attorneys may learn about quite a few state and local inquiries, especially when the inquiries are conducted pursuant to a joint federal-state program financed in part by federal dollars, such as the program at issue in this case.[18] Just how accessible to the Attorney General a typical state or local source will be, as compared to a federal source, is an open question. And it

––––––––––

[18] In some instances, federal law dictates that state and local governments receiving federal funds perform an audit of their programs. See 31 U. S. C. §7502(a)(1)(B) (requiring nonfederal entities that expend federal awards above a certain amount to "undergo a single audit" in accordance with specified conditions); Brief for State of Pennsylvania et al. as *Amici Curiae* 7–10 (discussing the Single Audit Act of 1984). It bears mention that, to the extent one is worried about Federal Government ignorance of state and local antifraud efforts, see *post*, at 10–11, today's ruling may induce federal authorities to pay closer attention to such efforts going forward.

is not even the right question. The statutory touchstone, once again, is whether the allegations of fraud have been "public[ly] disclos[ed]," §3730(e)(4)(A), not whether they have landed on the desk of a DOJ lawyer.

Respondent's argument also gives insufficient weight to Congress' decision to bar *qui tam* actions based on disclosures "from the news media." *Ibid.* Because there was no such bar prior to 1986, the addition of the news media as a jurisdiction-stripping category forecloses the suggestion that the 1986 amendments implemented a single-minded intent to increase the availability of *qui tam* litigation. And since the "news media" include a large number of local newspapers and radio stations, this category likely describes a multitude of sources that would seldom come to the attention of the Attorney General.

As for respondent and her *amici*'s concern that local governments will insulate themselves from *qui tam* liability "through careful, low key 'disclosures'" of potential fraud, Brief for American Center for Law and Justice as *Amicus Curiae* 17, this argument rests not just on speculation but indeed on rather strained speculation. Any such disclosure would not immunize the local government from FCA liability in an action brought by the United States, see *Rockwell Int'l Corp.* v. *United States*, 549 U. S. 457, 478 (2007)—and to the contrary it could tip off the Attorney General that such an action might be fruitful. It seems to us that petitioners have the more clear-eyed view when they assert that, "[g]iven the fact that the submission of a false claim to the United States subjects a defendant to criminal liability, fines, debarment, treble damages and attorneys' fees, no rational entity would prepare a report that self-discloses fraud with the sole purpose of cutting off *qui tam* actions." Reply Brief for Petitioners 19; see also *United States ex rel. Bly-Magee* v. *Premo*, 470 F. 3d 914, 919 (CA9 2006) ("The fear [of self-insulating disclosures] is unfounded in general because it is unlikely

that an agency trying to cover up its fraud would reveal
the requisite 'allegations or transactions' underlying the
fraud in a public document").[19]

Our conclusion is buttressed by the fact that Congress
carefully preserved the rights of the most deserving *qui
tam* plaintiffs: those whistle-blowers who qualify as origi-
nal sources.  Notwithstanding public disclosure of the
allegations made by a *qui tam* plaintiff, her case may go
forward if she is "an original source of the information."
§3730(e)(4)(A).  It is therefore flat wrong to suggest that a
finding for petitioners will "'in effect return us to the
unduly restrictive "government knowledge" standard'"
that prevailed prior to 1986.  Brief for United States 31
(quoting *Dunleavy*, 123 F. 3d, at 746); see Brief for Re-
spondent 34 (asserting that "petitioners' construction
would reimpose a form of the 'government knowledge' bar"
(capitalization omitted)).  Today's ruling merely confirms
that disclosures made in one type of context—a state or
local report, audit, or investigation—may trigger the
public disclosure bar.  It has no bearing on disclosures
made in other contexts, and it leaves intact the ability of
original sources to prosecute *qui tam* actions irrespective
of the state of Government knowledge.  Whether respon-
dent can qualify as an "original source," as that term is
defined in §3730(e)(4), is one of many issues that remain
open on remand.

---

[19] Petitioners and their *amici* also counter with public policy argu-
ments of their own.  Under the Court of Appeals' reading of the statute,
they allege, there is an increased likelihood that parasitic relators will
beat more deserving relators to the courthouse, Brief for Petitioners 31,
and that state and local governments will find their antifraud investi-
gations impeded, or will decline to conduct such investigations in the
first place, on account of "opportunistic potential relators trolling state
records and reports, available to the public," in search of a *qui tam*
claim, Brief for State of Pennsylvania et al. as *Amici Curiae* 11.

## VI

Respondent and the Solicitor General have given numerous reasons why they believe their reading of the FCA moves it closer to the golden mean between an inadequate and an excessive scope for private enforcement. Congress may well have endorsed those views in its recent amendment to the public disclosure bar. See n. 1, *supra.* With respect to the version of §3730(e)(4)(A) that is before us, however, we conclude that the term "administrative" in Category 2 is not limited to federal sources.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 08–304

———————

## GRAHAM COUNTY SOIL AND WATER CONSERVA-TION DISTRICT, ET AL., PETITIONERS *v.* UNITED STATES EX REL. KAREN T. WILSON

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[March 30, 2010]

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I join Parts I–III and V–VI of the Court's opinion. As for Part IV, I agree that the stray snippets of legislative history respondent, the Solicitor General, and the dissent have collected prove nothing at all about Congress's purpose in enacting 31 U. S. C. §3730(e)(4)(A). *Ante*, at 14–18. But I do not share the Court's premise that if a "'legislative purpose'" were "'evident'" from such history it would make any difference. *Ante*, at 17 (quoting *United States* v. *Bornstein*, 423 U. S. 303, 310 (1976)). The Constitution gives legal effect to the "Laws" Congress enacts, Art. VI, cl. 2, not the objectives its Members aimed to achieve in voting for them. See *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75, 79–80 (1998). If §3730(e)(4)(A)'s text includes state and local administrative reports and audits, as the Court correctly concludes it does, then it is utterly irrelevant whether the Members of Congress intended otherwise. Anyway, it is utterly impossible to discern what the Members of Congress intended except to the extent that intent is manifested in the *only* remnant of "history" that bears the unanimous endorsement of the majority in each House: the text of the enrolled bill that became law.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–304

_____

## GRAHAM COUNTY SOIL AND WATER CONSERVA-TION DISTRICT, ET AL., PETITIONERS *v.* UNITED STATES EX REL. KAREN T. WILSON

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[March 30, 2010]

JUSTICE SOTOMAYOR, with whom JUSTICE BREYER joins, dissenting.

The False Claims Act (FCA) divests federal courts of jurisdiction to hear *qui tam* lawsuits based on allegations or transactions publicly disclosed in a "congressional, administrative, or Government Accounting Office [(GAO)] report, hearing, audit, or investigation," unless the *qui tam* relator is an "original source" of the information. 31 U. S. C. §3730(e)(4)(A) (footnote omitted). Today, the Court reads the phrase "administrative . . . report, hearing, audit, or investigation" to encompass not only federal, but also state and local, government sources. In my view, the Court misreads the statutory text and gives insufficient weight to contextual and historical evidence of Congress' purpose in enacting §3730. I would affirm the judgment of the Court of Appeals and hold that "administrative" in the above-quoted provision refers only to Federal Government sources.[1]

_____

[1] As the Court notes, recent legislation amended the language of 31 U. S. C. §3730(e)(4). See *ante*, at 1–2, n. 1 (citing Pub. L. 111–148, §10104(j)(2), 124 Stat. 119). Like the Court, I use the present tense throughout this opinion in discussing the statute as it existed at the time this case was argued before this Court.

I

Section 3730(e)(4)(A) sets forth three categories of "public disclosure[s]" that trigger the FCA's jurisdictional bar: "allegations or transactions [1] in a criminal, civil, or administrative hearing, [2] in a congressional, administrative, or [GAO] report, hearing, audit, or investigation, or [3] from the news media."[2]   (Like the majority, I have inserted Arabic numerals and refer to the three phrases as "categories.")   "It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 133 (2000) (quoting *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 809 (1989)).   No party here disputes that "congressional" and "[GAO]" refer only to Federal Government sources.  *Ante*, at 6, and nn. 5–6.   As the Court acknowledges, *ante*, at 5, the word "administrative" is more capacious, potentially reaching not only federal, state, and local government sources but also disclosures by private entities.  See, *e.g.,* Black's Law Dictionary 42 (5th ed. 1979) (defining "administrative" as "pertain[ing] to administration, especially management, . . . [of] the execution, application or conduct of persons or things").

Like the Court of Appeals, I view Congress' choice of two "clearly federal terms [to] bookend the not-so-clearly federal term" as a "very strong contextual cue about the meaning of 'administrative.'"   528 F. 3d 292, 302 (CA4 2008).   "'The maxim *noscitur a sociis*, . . . while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of

---

[2] As the Court observes, in enacting §3730(e)(4)(A) Congress erroneously referred to the General Accounting Office—now renamed the Government Accountability Office—as the "Government Accounting Office."  *Ante*, at 6, n. 6.

unintended breadth to the Acts of Congress.'" *Gutierrez* v. *Ada*, 528 U. S. 250, 255 (2000) (quoting *Jarecki* v. *G. D. Searle & Co.*, 367 U. S. 303, 307 (1961)). Here, the immediate proximity of "congressional" and "[GAO]" suggests that "administrative" should be read, like its neighbors, as referring to Federal Government sources. If Congress had intended to include state or local government administrative materials, it could have said so, for instance by referring generically to "governmental" sources. See 528 F. 3d, at 304–305.

The Court applies the logic that underlies the *noscitur a sociis* canon in concluding that "administrative" does not refer to private entities because of the meaning suggested by the slightly more distant neighbors "report, hearing, audit, or investigation." See *ante*, at 5. I agree with the majority that "administrative" in this context does not reach private entities. But in my view, "congressional" and "[GAO]" provide the better textual grounding for that conclusion. I see no reason why the "administrati[on]" of a private university, for instance, could not issue a "report," order an "audit" or "investigation," or conduct a "hearing." Nor, contrary to the majority's suggestion, are private entities—particularly those receiving federal funds or participating in federal programs—incapable of making "public disclosure[s]" of fraud on the Federal Government.

Despite its own implicit reliance on the canon, the Court nevertheless rejects the Court of Appeals' application of *noscitur a sociis* to interpret the three terms in Category 2, concluding that "[a] list of three items, each quite distinct from the other no matter how construed, is too short to be particularly illuminating." *Ante*, at 6–7. The three terms in Category 2, the Court concludes, are "too few and too disparate" to justify invocation of *noscitur a sociis*. *Ante*, at 7. We have not previously constrained the canon in this way, and I would not do so here.

To take just one example, in *Jarecki* we construed the

statutory term "'abnormal income,'" which the statute
defined to include income resulting from "'exploration,
discovery, or prospecting.'" 367 U. S., at 304–305 (quoting
§456(a) of the Internal Revenue Code of 1939). Recogniz-
ing that the word "'[d]iscovery'" is "usable in many con-
texts and with various shades of meaning," we observed
that it "gathers meaning from the words around it" and
concluded that "[t]he three words in conjunction . . . all
describe income-producing activity in the oil and gas and
mining industries." *Id.,* at 307. As a result, and in light of
other contextual evidence supporting the same conclusion,
we held that sales of newly invented drugs or camera
equipment did not give rise to "abnormal income" even if
such inventions might otherwise be understood as "dis-
cover[ies]." See *id.,* at 307–313. In my view, the three
terms in Category 2 are no more "distinct" or "disparate,"
*ante*, at 7, than the phrase at issue in *Jarecki*, particularly
given the expansive plain meaning of "discovery." Cf.
*ante*, at 7, n. 7. Here, application of the *noscitur a sociis*
principle readily yields a common feature: The sources at
issue are federal in nature, not related to state or local
governments or private entities. See *Third Nat. Bank in
Nashville* v. *Impac Limited, Inc.*, 432 U. S. 312, 322–323,
315 (1977) (applying principle that "words grouped in a
list should be given related meaning" where term "'injunc-
tion'" was "sandwiched" between two other words in the
statutory phrase "'attachment, injunction, or execution'").[3]

––––––––––

[3] The Court relies on *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 338–339
(1979), for the proposition that we should not "'rob'" any of the three
terms in Category 2 of 31 U. S. C. §3730(e)(4)(A) of "'its independent
and ordinary significance.'" *Ante*, at 7. But *Reiter* involved the statu-
tory term "business or property." Those two words less readily suggest
a shared limiting principle than do "congressional, administrative, or
[GAO]." Moreover, our concern about "rob[bing]" the word "'property'"
of its broader meaning rested on a desire not to "ignore the disjunctive
'or'" in the statutory pairing. 442 U. S., at 338–339; see also *id.*, at 339
("Canons of construction ordinarily suggest that terms connected by a

The Court draws additional support for its conclusion from reference to the provision's "larger scheme," *ante*, at 8—*i.e.*, the sources enumerated in Categories 1 and 3. Although the scope of Category 1 is not before us today (and although this Court has never addressed that question), the Court believes that reading Category 2 as limited to Federal Government sources would be inconsistent with decisions of lower courts that have interpreted "criminal, civil, or administrative hearing[s]" in Category 1 to include both state and federal proceedings. There is no conflict, however, if both categories are read, as respondent and the Solicitor General urge, as exclusively federal. See Brief for Respondent 23–24; Brief for United States as *Amicus Curiae* 25–26. Even reading Category 1 more broadly, however, does not change the exclusively federal nature of "congressional" and "[GAO]," which undermines whatever inference might be drawn from taking the statutory terms in strict succession. Treating the entirety of §3730(e)(4)(A) as an undifferentiated list of items gives short shrift to the syntactical choices Congress made in offsetting each category with commas and prepositions, and in providing distinct classes of adjectives that modify different nouns.

Finally, the Court also views "news media" as "distinctly nonfederal in nature." *Ante*, at 8–9. But "news media" does not seem particularly illuminating in this context. As the Court of Appeals observed, although media sources

_____

disjunctive be given separate meanings"). Because Congress did not employ a completely disjunctive list in §3730(e)(4)(A)—*i.e.*, "congressional *or* administrative *or* [GAO]"—the *Reiter* principle applies with less force. Cf. *Garcia* v. *United States*, 469 U. S. 70, 73 (1984) (applying disjunctive principle in construing statutory prohibition on assault and robbery of any custodian of "'mail matter *or* of any money *or* other property of the United States,'" and observing that "[t]he three classes of property . . . are each separated by the conjunction 'or'" (quoting 18 U. S. C. §2114; some emphasis deleted)).

may be national or local in scope, that distinction is not analogous to the difference between federal and state government sources. 528 F. 3d, at 304.

## II

In my view, the statutory context and legislative history are also less "opaque," cf. *ante*, at 17, and more supportive of the reading adopted by the Court of Appeals, than the majority today acknowledges. While the legislative record is concededly incomplete, it does provide reason to exercise caution before giving the statutory text its broadest possible meaning—*i.e.*, to encompass not only federal, but also state and local, government sources.

Three points are particularly salient. First, prior to the 1986 amendments, the "Government knowledge" bar unquestionably referred only to information in the possession of the Federal Government.[4] Even still, the bar was criticized as overly restrictive. A Senate Report on an initial version of the 1986 legislation, for instance, described the FCA's history and need for legislative reform, noting "several restrictive court interpretations of the act . . . which tend to thwart the effectiveness of the statute." S. Rep. No. 99–345, p. 4 (1986) (hereinafter S. Rep.). For instance, courts had applied the Government knowledge bar "even if the Government makes no effort to investigate or take action after . . . original allegations [a]re received." *Id.,* at 12 (citing *United States ex rel. Lapin* v. *International Business Machines Corp.*, 490 F. Supp. 244 (Haw. 1980)).[5]

---

[4] As originally enacted in 1943, the bar applied to suits "based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought." 57 Stat. 609. In 1982, Congress recodified the provision to apply to suits "based on evidence or information the Government had when the action was brought." 96 Stat. 979.

[5] The Senate Report also discussed *United States ex rel. Wisconsin* v. *Dean*, 729 F. 2d 1100 (CA7 1984), in which the court barred Wisconsin

Second, there is more support than the Court recognizes for the proposition that Congress sought in the 1986 amendments to broaden the availability of *qui tam* relief. The Senate Report characterized the reform effort as intended to "enhance the Government's ability to recover losses sustained as a result of fraud against the Government" and dwelt at length on the "severe" and "growing" problem of "fraud in Federal programs." S. Rep., at 1–2; accord, H. R. Rep. No. 99–660, p. 18 (1986) ("Evidence of fraud in Government programs and procurement is on a steady rise"). The Senate Report also articulated a desire to "encourage any individual knowing of Government fraud to bring that information forward," and it identified as "perhaps the most serious problem plaguing effective enforcement [of antifraud laws] a lack of resources on the part of Federal enforcement agencies." S. Rep., at 2, 7.[6]

Consistent with these expressed views, the enacted legislation was replete with provisions encouraging *qui*

_____

from bringing a *qui tam* suit for Medicaid fraud because the State had previously disclosed the information to the Federal Government, even when the State's own investigation had discovered the fraud. S. Rep., at 12–13. Lower courts have observed that the *Dean* decision was controversial and appears to have motivated the inclusion of the "original source" exception in the 1986 jurisdictional bar. See, *e.g., Wang* v. *FMC Corp.*, 975 F. 2d 1412, 1419 (CA9 1992); see also S. Rep., at 13 (noting resolution by the National Association of Attorneys General criticizing *Dean* and urging Congress to address the problem).

[6] In introducing a later and near-final version of the bill, Senator Grassley described the reform effort as stemming "from a realization that the Government needs help—lots of help—to adequately protect taxpayer funds from growing and increasingly sophisticated fraud." 132 Cong. Rec. 28580 (1986); see also *United States ex rel. Siller* v. *Becton Dickinson & Co.*, 21 F. 3d 1339, 1347 (CA4 1994) ("By 1986, when section 3730(e)(4) was enacted, Congress had come to the conclusion that fraud against the Government was apparently so rampant and difficult to identify that the Government could use all the help it could get from private citizens with knowledge of fraud" (internal quotation marks omitted)).

*tam* actions. By replacing the Government knowledge bar
with the current text of §3730(e)(4)(A) and including an
exception for "original source[s]," Congress "allowed pri-
vate parties to sue even based on information already in
the Government's possession." *Cook County* v. *United
States ex rel. Chandler*, 538 U. S. 119, 133 (2003). The
1986 amendments also established the right of *qui tam*
relators to continue as a party to a suit after the Govern-
ment intervenes, 31 U. S. C. §3730(c)(1) (1988 ed.); in-
creased the percentage of recovery available as an incen-
tive for private suits, §3730(d)(1); and created a cause of
action against employers who retaliate against *qui tam*
relators, §3730(h).[7]

---

[7] See also 1 J. Boese, Civil False Claims and *Qui Tam* Actions
§1.04[G], p. 1–22 (Supp. 2007) ("[V]irtually all the changes introduced
in th[e] section [of the 1986 amendments addressing *qui tam* actions]
expanded the rights of *qui tam* relators"). The amendments also
contained a number of provisions facilitating enforcement generally,
*e.g.*, lowering the requisite showing of intent by making clear that
"knowing" violations require "no proof of specific intent to defraud," 31
U. S. C. §3729(b)(1) (1988 ed.); lengthening the statute of limitations,
§3731(b); and authorizing treble damages, §3729(a).

The Court fairly observes that the addition of "news media" to the
jurisdictional bar undercuts attributing to Congress a "single-minded"
intent to expand the availability of *qui tam* relief. *Ante*, at 19. But
neither does that provision support reading Category 2 to its broadest
possible extent. Moreover, barring suits based on "news media" disclo-
sures may not have constituted a particularly significant expansion of
existing law. Courts had applied the pre-1986 Government knowledge
bar to dismiss actions based on information reported in the news
media. In *United States ex rel. Thompson* v. *Hays*, 432 F. Supp. 253,
256, 255 (DC 1976), the court dismissed a suit based on evidence
"gleaned from sources in the news media which received widespread
public attention [alleging fraud by a Member of Congress]," when the
Department of Justice "first obtained information regarding the claims
. . . as a result of [a] *Washington Post* article." Similarly, the court in
*United States* v. *Burmah Oil Co.*, 558 F. 2d 43, 46, n. 1 (CA2 1977) *(per
curiam)* characterized the Government knowledge bar as "dis-
courag[ing] the filing of actions by parties having no information of
their own to contribute, but who merely plagiarized information in

To be sure, Congress was also concerned in 1986, as in 1943, with guarding against purely opportunistic, "parasitic" *qui tam* relators. See S. Rep., at 10–11 (describing history of parasitic suits and the 1943 amendments); *ante*, at 12–13. Lower courts have viewed the 1986 amendments as striking a balance between the "twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own." *United States ex rel. Springfield Terminal R. Co.* v. *Quinn*, 14 F. 3d 645, 651 (CADC 1994). But evidence that Congress sought to balance two competing goals supports moderation in interpreting an arguably ambiguous statutory text, rather than woodenly reading the statutory language to its fullest possible extent.

Third, the legislative record "'contains no hint of any intention'" to bar suits based on disclosures from state or local government sources. Brief for United States as *Amicus Curiae* 20 (quoting *United States ex rel. Anti-Discrimination Center of Metro N. Y., Inc.* v. *Westchester Cty.*, 495 F. Supp. 2d 375, 383 (SDNY 2007)). Inclusion of state or local government sources would have constituted a significant departure from the Federal Government knowledge bar that had existed for four decades by 1986. But neither the initial bills reported by the Senate and House Committees nor statements by individual Members of Congress about subsequent versions of the legislation suggest any consideration or debate about expanding the pre-1986 bar to apply to state or local government

--------

indictments returned in the courts, newspaper stories or congressional investigations." Congress could have reasonably assumed in 1986 that news media would report on the kinds of high-profile frauds that would naturally—perhaps as a result of the reporting—come to the Government's attention, and thus would already have been covered under existing law.

sources.[8]

Although these points do not definitively resolve the question presented today, to my mind they counsel against reading §3730(e)(4)(A) (2006 ed.) so broadly as to disturb the balance Congress evidently sought to achieve through the 1986 amendments. Today's decision risks such a result. The Court imposes a jurisdictional bar that is by all appearances *more* restrictive of *qui tam* suits than the pre-1986 regime. Construing §3730(e)(4)(A) to encompass the thousands of state and local government administrative reports produced each year effectively imputes to the Federal Government knowledge of such sources, whether or not the Government is aware of the information or in a

_____

[8] In June 1986, the House Committee on the Judiciary reported a bill that would have barred *qui tam* actions based on information "which the Government disclosed as a basis for allegations made in a prior administrative, civil, or criminal proceeding," "disclosed during the course of a congressional investigation," or "disseminated by any news media." H. R. Rep. No. 99–660, pp. 2, 3 (internal quotation marks omitted). The references to information disclosed by the Government itself (with a capital "G") and to "congressional investigation[s]" connote federal, not state or local, government sources. In July, the Senate Committee on the Judiciary reported its own version of the bill, barring actions "based upon allegations or transactions which are the subject of a civil suit in which the Government is already a party, or within six months of the disclosure of specific information relating to such allegations or transactions in a criminal, civil, or administrative hearing, a congressional or Government Accounting Office report or hearing, or from the news media." S. Rep., at 43. The reference to suits in which the Federal Government is a party and absence of the ambiguous term "administrative" in the bill's reference to "congressional or [GAO]" reports or hearings, similarly tend to exclude disclosures from state or local government reports. The enacted legislation did differ in several respects from the reported bills, but the subsequent legislative record contains no reference to the inclusion of state or local government sources. See, *e.g.,* 132 Cong. Rec. 20535–20537 (statement of Sen. Grassley); *id.*, at 29321–29322 (statements of Reps. Glickman and Berman).

position to act on it.[9]  The Solicitor General specifically warns that while information in federal administrative audits or investigations is "readily available" to attorneys at the Department of Justice, "many state and local reports and investigations never come to the attention of federal authorities."  Brief for United States as *Amicus Curiae* 22.  The Court dismisses this concern as "sheer conjecture," postulating that Government lawyers "may" in fact learn about "quite a few" state or local reports and investigations, particularly in joint state-federal programs.[10]  *Ante*, at 18.  Perhaps so.  But absent any concrete reason to believe otherwise, I would not so readily dismiss the formal representation of the Executive Branch entity with responsibility for, and practical experience in, litigating FCA claims on behalf of the United States.

In sum, the statute's plain text, evidence of Congress' intent to expand *qui tam* actions, and practical conse-

———————

[9] Of course, 31 U. S. C. §3730(e)(4)(A) (2006 ed.) speaks of "public disclosure," not notice to the Government.  But the requirement of a "public" disclosure countenances notice, both to the public and otherwise.  Indeed, a number of lower courts look to whether the Federal Government is "on notice" of alleged fraud before concluding that a particular source is a "public disclosure of allegations or transactions" under §3730(e)(4)(A).  See, *e.g., United States ex rel. Poteet* v. *Medtronic, Inc.*, 552 F. 3d 503, 512 (CA6 2009) ("[A] public disclosure reveals fraud if the information is sufficient to put the government on notice of the likelihood of related fraudulent activity" (internal quotation marks omitted)); *United States* v. *Alcan Elec. & Eng., Inc.*, 197 F. 3d 1014, 1020 (CA9 1999) (similar); *United States ex rel. Fine* v. *Sandia Corp.*, 70 F. 3d 568, 572 (CA10 1995) (similar).

[10] The Court observes that federal law requires some recipients of federal funds to conduct audits, *ante*, at 18, n. 18, and *amici* States point to the auditing and reporting requirements of the Single Audit Act of 1984, Brief for State of Pennsylvania et al. as *Amici Curiae* 7–10 (hereinafter States Brief).  But neither the Court nor the *amici* rebut the Solicitor General's pragmatic observation that "the vague and summary nature of many of those reports . . . does not . . . alert the federal government of fraud."  Brief for United States as *Amicus Curiae* 31.

quences of a more expansive interpretation together suggest Category 2 is most reasonably read to encompass federal, but not state or local, government sources.[11]

\*     \*     \*

For the reasons given above, I would affirm the judgment of the Court of Appeals, and respectfully dissent.

———————

[11] The majority notes in passing several policy arguments advanced by petitioners and their *amici*. *Ante*, at 20, n. 19. None merits much weight. Petitioners are concerned about a race to the courthouse, in which parasitic relators will capitalize on information released in a state or local government report to the disadvantage of a slow-moving insider. Brief for Petitioners 31. But the FCA's first-to-file provision, 31 U. S. C. §3730(b)(5), reflects Congress' explicit policy choice to encourage prompt filing and, in turn, prompt recovery of defrauded funds by the United States. *Amici* States are concerned that relators may interfere with ongoing state and local government investigations by "trolling state records and reports" for evidence of fraud. States Brief 11. But some state freedom-of-information laws exempt materials related to ongoing civil investigations. See, *e.g.,* Kan. Stat. Ann. §45–221(a)(11) (2008 Cum. Supp.); Pa. Stat. Ann., Tit. 65, §67.708(b)(17) (Purdon Supp. 2009). In any event, the FCA contains no provision giving state or local governments a privileged position as *qui tam* relators or, with respect to local governments, defendants.